**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TILLIE PANIAGUA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 C 03320 |
| v. ) | |
| ) | Judge John J. Tharp, Jr. |
| MAX 18, INC. d/b/a MORGAN's BAR and ) | |
| GRILL, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the plaintiff's motion[1] to strike, based upon fraud, the 2012 affidavit of non-party Habiba Kamel in support of defendant Max 18's motion for summary judgment. The Court has reviewed the briefs and supplements filed by the parties and has conducted two evidentiary hearings for the purpose of determining the authenticity of the signature on the Kamel affidavit and what, if any, sanctions should be levied if it was a forgery. The Court first summarizes the procedural history and then sets forth it factual findings.

**PROCEDURAL HISTORY**

In her Fourth Amended Complaint, Tillie Paniagua alleges that while employed as a server and bartender at Morgan's, owned by defendant Max 18, she suffered sexual harassment and was then retaliated against and constructively discharged for reporting it. Among the harassing behavior that Paniagua identified was a manager's playing of obscene or pornographic videos at Morgan's where Paniagua and other employees could see it. Paniagua alleges that after

---

[1] Plaintiff's motion was styled as a motion to amend her complaint based upon fraud on the court, see Dkt. # 89, but the Court, with no objection from the parties, construed the motion as a motion to strike and ordered briefing and further hearings in that posture. See 7/23/2013 Order, Dkt. # 92.

she complained about this and other harassment, she was demoted from bartender to server, had her scheduled shifts shortened, and was not permitted to trade bartending shifts with her then-coworker Habiba Kamel when Kamel asked her to, among other things.

After the close of discovery, on October 30, 2012, Max 18 moved for summary judgment. In support of its statement of undisputed material facts, Max 18 submitted six affidavits, including one purportedly signed by Habiba Kamel, no longer a Max 18 employee. *See* Kamel 2012 Affidavit, Dkt. # 60-2, Exhibit 8. The 19-paragraph affidavit, bearing Kamel's purported signature and the date of February 23, 2012, recounts events from April and May 2006 and asserts, among other things, that pornographic videos were not played at Morgan's and that Kamel had never asked to trade shifts with Paniagua.

Paniagua responded to the summary judgment on November 29, 2012, and Max 18 filed its reply brief on January 28, 2013, after which the Court took the motion under advisement. Before any ruling, Plaintiff filed what was then styled as a motion to amend, and has now been construed as a motion to strike, alleging that the Kamel 2012 Affidavit filed by Max 18 was a forgery. In support of the motion, Paniagua attached another affidavit, in which Habiba Kamel attested that she did not sign the affidavit dated February 23, 2012, and had in fact refused a request from Morgan's in September 2012 that she come in and sign an affidavit. *See* Kamel 2013 Affidavit, Dkt. # 89-2. The second affidavit, dated July 13, 2013 ("Kamel 2013 Affidavit"), directly contradicted several factual assertions from the 2012 Kamel affidavit; for example, Kamel attested that offensive videos were played at Morgan's, that Paniagua had complained about them, and that Kamel had indeed asked Paniagua to work shifts for her.

At the first in-court hearing on Paniagua's motion, the Court ordered a response from Max 18 that addressed "the factual questions of the authenticity of the signature on the [2012

2

Kamel affidavit]." 7/23/2013 Order, Dkt. # 92. In the defendant's first response (Dkt. # 93), counsel for Max 18, Scott Schimanski, represented that neither he nor his client could verify the authenticity of the signature on the 2012 Kamel affidavit, and that no one could recall ever having seen Kamel sign it. Schimanski represented, however, that he and his client "have also been able to further verify each and all of the statements contained in the [2012] affidavit of Habiba Kamel." Response, Dkt. # 93, at 2. But his statement was inconsistent with the balance of the response, in which Max 18 conceded that "Max 18 has not been able to further verify any conversation that occurred between Habiba Kamel and Paniagua or Habiba Kamel's knowledge of the music videos admittedly played at Max 18," and further that Max 18 was unable to verify "some of the statements contained within the Affidavit of Habiba Kamel." The defendant requested leave to withdraw the affidavit; alternatively, it indicated that it did not object to the motion to strike the affidavit.

The Court found this response lacking and issued an order requiring Mr. Schimanski to provide a further response and affidavit "detailing, at a minimum: (i) how counsel came into possession of the Kamel affidavit; and (ii) what efforts, if any, counsel made to verify the authenticity and accuracy of the affidavit." 8/2/13 Order, Dkt. # 95.

Mr. Schimanski's supplemental response, *see* Dkt. # 96, explained that he had drafted six affidavits based upon information he had gathered from Max 18 dating back to 2006. According to Schimanski, he drafted the affidavits from his memory of that information and "[e]ach and all of the statements contained in the Affidavits, including the Affidavit of Habiba Kamel, were verified to the extent possible at the time for accuracy by cross reference to other records and

3

statements."[2] Schimanski delivered the six affidavits to Paul Engberg, the owner and general manager of Max 18, on February 20, 2012, and he received signed affidavits back from Mr. Engberg on October 5, 2012. The affidavits bear the following dates of signature: (i) Kamel–February 23, 2012; (ii) Passarelli–February 23, 2012; (iii) Deutscher–February 28, 2012; (iv) Engberg–February 28, 2012; (v) DiGrazia–February 29, 2012; and (vi) Witt–February 29, 2012.

According to the supplemental response, Mr. Schimanski "reviewed each and all of the Affidavits for any revisions . . . and found none." All six affidavits were "returned with original ink signatures and dates affixed to the Affidavits," and "Mr. Schimanski had no reason to believe that any of the signatures affixed to any of the six (6) Affidavits was not authentic" or that "any of the Affidavits, including the Affidavit of Habiba Kamel was inaccurate in any way." In Mr. Schimanski's judgment, "based upon all of the information that had been gathered in the more than six (6) years providing legal representation related to claims by Paniagua," the affidavits each "had sufficient factual support."

The Court still found Max 18's response insufficient to make a reasoned judgment about whether the Kamel 2012 Affidavit had been forged, and if so, who should be held responsible for the fraud on the Court. It ordered an evidentiary hearing on "the authenticity and accuracy of the content of the original affidavit of Habiba Kamel submitted by the Defendant" and "how that issue bears on the pending motions before the Court and whether any sanctions are warranted with respect to the submission of that affidavit (or any other that has been submitted in this matter)." 8/9/2013 Order, Dkt. # 99. In addition, Mr. Schimanski was required to produce to the Court for *in camera* inspection, "all notes and other documents evidencing information provided

---

[2] As later became evident, however, no "records or other statements" existed that reflected any conversation with Ms. Kamel by Mr. Schimanski or anyone else.

by Ms. Kamel to the Defendant, defense counsel, or to any of their respective employees." No such documentation was produced.

At the evidentiary hearing on August 28, 2013, the Court began by examining Mr. Schimanski under oath. He testified that he drafted the six affidavits based upon "oral information that [he] had recollected" and that he "had no notes or other written materials that anyone else had created that documented anything that was including is Ms. Kamel's affidavit." Mr. Schimanski "had information" that he had gathered from Max 18 employees Paul Engberg, Diana Passarelli, and Dan Deutscher (who departed Max 18 in March 2013), as well as information he received during an administrative hearing held in connection with a different former employee's civil rights claim against Max 18. After Mr. Schimanski delivered the drafted affidavits to Mr. Engberg on February 20, 2012, he met with Mr. Engberg but did not make any changes to the affidavits based on that conversation. Mr. Engberg agreed to procure signatures from the employees and former employees on whose behalf Mr. Schimanski had drafted affidavits. Mr. Schimanski received the affidavits back from Mr. Engberg via Express Mail on October 5, 2012. Mr. Schimanski did not have any communications with Mr. Engberg about the affidavits between the time he delivered them in February and late September, when he told Mr. Engberg that he needed the affidavits back because of the briefing schedule that had been set on Max 18's summary judgment motion.

The plaintiff, Tillie Paniagua, testified that on June 23, 2013, she received a copy of the Kamel 2012 Affidavit from her attorney, Hector Morales. She also recalled having seen the affidavit at some point in 2012. Later, reviewing the affidavit more closely in June 2013, she contacted Ms. Kamel, with whom she had been in contact periodically as a personal acquaintance. Ms. Kamel said that she had never signed anything for Max 18 and asked Ms.

5

Paniagua to send her the affidavit. Once she received an electronic copy of the affidavit, Ms. Kamel told Ms. Paniagua that she had not signed it; at that point, Ms. Paniagua advised her attorney of the discrepancy.

Ms. Kamel testified that the first time she had seen the Kamel 2012 Affidavit was when Tillie Paniagua emailed it to her in June 2013. She testified that the signature on the Kamel 2012 Affidavit is not her signature, and that the signature on the Kamel 2013 Affidavit is hers. Ms. Kamel testified that Diana (Passarelli) from Max 18 contacted her in September 2012 requesting that she come in and sign an affidavit at the request of Paul Engberg. Ms. Kamel testified that the day before this call, in September 2012, she had stopped by Morgan's because she had been interviewing a baby-sitter nearby. The next day, Passarelli called. Kamel recalled telling Passarelli that she did not think she was obligated to go in and sign anything, and she thought it would be an inconvenience to do so, though she was not sure whether she had made it clear to Passarelli that she did not intend to sign an affidavit. Kamel indicated that she had probably stopped in at the bar to visit about four or five times total in 2012, but did not sign anything there. Ms. Kamel testified that Ms. Paniagua had talked to her about her lawsuit around the time it was filed, and that she had also been contacted by an investigator whose call she did not return.

Upon reviewing the 2012 Kamel affidavit, Ms. Kamel testified that the substance of the affidavit was inaccurate in several respects. She stated that some or all of paragraphs 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18 were not true or would not be her testimony. She further testified that the 2013 Affidavit, which she signed, appeared to have been prepared based on her own notes that she had provided to Paniagua's attorney, Mr. Morales, and was accurate, although she conceded that a clarification was needed with respect to Paragraph 5.

At the August 28 hearing, the Court also heard testimony from former Max 18 employee Dan Deutscher, as well as current employees Diana Passarelli and Paul Engberg—all of them managers and former defendants in this case. They each testified that they had reviewed and signed their own affidavits, which were accurate, although they did not specifically recall giving information to Mr. Schimanski to put into the affidavits.

Diana Passarelli, whose affidavit is dated February 23, 2012, testified that she was by herself in Engberg's office when she read and signed her affidavit. Mr. Engberg had given her the affidavit that day. As far as Ms. Passarelli remembered, Habiba Kamel was never in the office or at Morgan's on February 23, 2012 (that date on the Kanel 2012 Affidavit). Passarelli testified that she called Ms. Kamel and asked her to come in and sign an affidavit. She had a personal discussion with Ms. Kamel, with whom Passarelli is friendly, and then asked if Kamel could come in "talk to Paul [Engberg]" and sign a paper. Passarelli did not testify as to when she made this call, but did not dispute that the call was made in September 2012 when that was a factual predicate of questions posed to her. Passarelli did not recall any resistance from Ms. Kamel, and to Passarelli it "sounded like she was going to come in and talk to [Engberg] and sign it." After the conversation, Passarelli saw Kamel at Morgan's "one time." Passarelli never confirmed with Ms. Kamel that she had signed the affidavit. Passarelli never saw the Kamel affidavit, either before or after contacting Ms. Kamel, and she did not know who signed it.

Deutscher's affidavit is dated February 28, 2012. Mr. Deutscher testified that he met with Mr. Engberg in Enberg's office and then reviewed and signed the affidavit after Engberg left. He played no role in getting others to sign their affidavits. Until he heard shortly before the hearing, from Mr. Engberg and Mr. Schimanski, that the Kamel 2012 Affidavit was being challenged, he had never had any conversations about that affidavit, or its authenticity or accuracy, with anyone.

7

He testified that no one had ever told him who signed the Kamel 2012 affidavit and that he did not know who had done so.

Paul Engberg, the owner and general manager of Max 18, testified that he had been Mr. Schimanski's primary source for information throughout the litigation. He testified that when Mr. Schimanski first delivered the unsigned affidavits, he brought them into his office. Mr. Engberg testified that, the day after receiving the unsigned affidavits from Mr. Schimanski on February 20 with only the instruction "just to get the affidavits signed," he had asked Ms. Passarelli to get Ms. Kamel's signature and that Ms. Passarelli reported to him the same day that she had spoken to Ms. Kamel about the affidavit. He recalled that on February 23, 2012, he asked Diana Passarelli to read and sign her affidavit. That day, he did not see Habiba Kamel in his office or anywhere on the premises. As to the Kamel 2012 affidavit, Mr. Engberg testified that he "gave it to Ms. Passarelli," and that he asked her to contact Ms. Kamel. Otherwise, he "didn't assign anybody else to contact anybody else."

Engberg testified that Dan Deutscher was the next affiant that Engberg saw. Engberg gave Deutscher his affidavit to read and sign. Engberg's affidavit, like Deutscher's, is dated February 28, 2013. After he and Deutscher had signed, Engberg put the three signed affidavits back into the folder that Mr. Schimanski had given him, and he put the folder with the signed and unsigned affidavits in an unlocked drawer behind the bar at Morgan's so that "the three people" who still had to come in and sign could access them. Engberg testified that subsequently he had been able to confirm with both Carol Witt and Jamie DeGrazia, two other employee-affiants, that they had read and signed their affidavits, although he had not seen them so do. He was not able to do so with Ms. Kamel. According to Mr. Engberg, Carol Witt—whose affidavit is dated February 29, 2013— approached him and told him that she had signed, and a day later, Engberg

checked the folder and saw that all of the affidavits, including Kamel's, had been signed. This was, he testified, about a week after he had placed the affidavits in the folder behind the bar. Engberg then put the signed affidavits in a file in his office and kept them there for months until Mr. Schimanksi asked for them back in September 2012. Engberg testified that no had told him that he or she signed the Kamel 2012 affidavit on behalf of Ms. Kamel, that he had no knowledge of actually signed it, and that he himself did not sign it.

The Court held a further evidentiary hearing on September 12, 2013, at which Carol Witt and Jamie DiGrazia testified. At that hearing Ms. Witt and Ms. DiGrazia each testified that she had reviewed and signed her own affidavit on February 29, 2012. Ms. DiGrazia, who has not worked for Max 18 for about three years, testified that she went into Morgan's and "whoever was working behind the bar" gave her the document to sign, and she gave the affidavit back to the same person when she had signed it. Ms. Witt, who also does not work for Max 18 anymore, also signed her affidavit at the bar on February 29, 2012, and handed it back to a male bartender.

After the two evidentiary hearings, the Court solicited supplemental briefs from both parties solely on the "fact issues" of the authenticity of the Kamel 2012 Affidavit and how it came to be filed in support of Max 18's summary judgment motion. 9/13/2013 Order, Dkt. # 104. Both sides submitted supplemental briefs, although they went far beyond the scope of the factual issues identified by the Court to argue the significance (or, from the defendant's point of view, the lack of significance) of the potential fraud.

Regarding the factual question, the plaintiff's supplemental submission urges the Court to conclude that the 2012 Kamel Affidavit is a forgery and that it contains false statements. The defendant, on the other hand, says that the Court should "presume the newly discovered

9

discrepancy regarding the Affidavit of Habiba Kamel to be suspect" and should "suspect the veracity of the forgery claim now being made by Paniagua and Habiba Kamel."

## FINDINGS

Having reviewed all of the filings and testimony on the issue of the authenticity of the 2012 Kamel affidavit, and weighed the credibility of the witnesses, the Court makes the following findings:

- Habiba Kamel did not sign the 2012 Kamel Affidavit on February 23, 2012, or at any time.

- The 2012 Kamel Affidavit does not accurately reflect the testimony of Habiba Kamel.

- Habiba Kamel executed the Kamel 2013 Affidavit on July 13, 2013.

- Certain of the facts set forth in the Kamel 2012 Affidavit, particularly statements regarding things she said, heard, or observed, and her opinions, were unverifiable as Kamel's testimony without contact with Kamel herself. These include paragraphs 5-17.

- Attorney Schimanski did not have any contact with Kamel at any time before drafting an affidavit on her behalf, nor did any representative of Max 18 have discussions with Kamel regarding the substance of the facts that were set forth in the Kamel 2012 Affidavit.

- Mr. Schimanski drafted the six affidavits from his own memory based principally on information supplied to him by Max 18's principal, Paul Engberg, at some point between 2006 and 2012.

- Mr. Schimanski believed based on prior communications with Engberg and others that the information he set forth in the affidavits to be factually accurate, but he did not have a reasonable basis for believing that Habiba Kamel would testify to certain facts set forth in the 2012 affidavit, principally those set forth in paragraphs 5-17.

- The six affidavits that Mr. Schimanski drafted were delivered unsigned to Paul Engberg on February 20, 2012.

- Mr. Engberg's account of how the signatures on the affidavits were secured lacks credibility with respect to several significant points:

- o Mr. Engberg did not direct Ms. Passarelli to contact Habiba Kamel about signing her affidavit on February 21, 2012, the day after Mr. Schimanski delivered them to Engberg. Mr. Engberg did not speak to Ms. Passarelli about the affidavits until February 23, three days after Schimanski delivered them, when he gave Passarelli her affidavit to sign.

- o According to his testimony, Mr. Engberg did not put the Kamel and other affidavits in a folder behind the bar until he, Passarelli, and Deutscher had already signed their affidavits. The Deutscher and Engberg affidavits both bear the date of February 28, 2012, which both men testified was accurate. The affidavits of DiGrazia and Witt were signed the next day, February 29, 2012. And Mr. Engberg said that he checked the folder and confirmed all the signatures were there the day after February 29 (*i.e.*, March 1), only two days later. Mr. Engberg testified, however, that he left the folder behind the bar for about a week before checking it.

- o If he placed the unsigned Kamel affidavit behind the bar on or after February 28, as he testified, and if all of the affidavits were signed by March 1, then Mr. Engberg should have questioned how Kamel could have signed her affidavit on February 23 (as it is dated)— five days before he ever left it out for her to sign, as one of the "three people" who not signed their affidavits as of March 28.

- All six affidavits were not signed by February 29, when Witt informed Engberg that she had signed hers. Ms. Kamel testified, and Ms. Passarelli did not dispute, that Passerelli did not call Kamel until September 2012. There would have been no reason for Passerelli to make that call if (i) Kamel had already signed the affidavit or (ii) someone had already forged Kamel's signature on the affidavit.

- Kamel did not sign the affidavit after being contacted by Diana Passarelli on behalf of Paul Engberg in September 2012.

- The identity of the person who affixed what purports to be Habiba Kamel's signature on the Kamel 2012 Affidavit remains unknown, but the signature was placed there by someone acting on behalf of Max 18, after Passerelli contacted Kamel in September 2012, in an effort to enhance the prospect that Max 18 would obtain judgment against Paniagua.

- The 2012 Kamel Affidavit was submitted by Max 18 in bad faith.

- The six affidavits were in the exclusive control of Max 18 at Morgan's from February 20, 2012, until October 4, 2012.

- Mr. Engberg sent six signed affidavits to Mr. Schimanski on October 4, 2012; the affidavits were received by Schimanski on October 5, 2012.

- Mr. Schimanski did not sign the 2012 Kamel Affidavit.

## DISCUSSION

As set forth in its findings, the Court has concluded that a fraudulent affidavit was submitted in support of Max 18's motion for summary judgment. The Court finds that both Habiba Kamel and Tillie Paniagua testified credibly on this subject. In particular, the Court credits Ms. Kamel's testimony because it is clear that she maintained relationships with both Paniagua and with Max 18 employees, and she has no obvious bias. She lacks any incentive to lie; she is not a party to this case, and her efforts to remedy the forgery only create additional burdens for her. Moreover, if Ms. Kamel really had signed the 2012 affidavit, she would be inviting much scrutiny by now claiming otherwise; beyond having perjured herself in the second affidavit, she would have to expect the emergence of some witness to her signature or at least to her presence at Morgan's on the date she allegedly signed the first affidavit—when they were still being kept in Engberg's office, where he, Deutscher, and Passarelli had signed them. But no one can place Kamel at Morgan's on the date of her purported signature. Moreover, at the time Ms. Kamel came forward with her 2013 affidavit, she had no reason to be aware of the careless procedures that Max 18 and its counsel had used in obtaining signatures, but her testimony is consistent with the lack of careful controls.

On the basis of the evidentiary record, the Court is not prepared to make a finding as to who specifically forged Kamel's signature on the 2012 affidavit, but it is plain that whoever forged Ms. Kamel's signature on the 2012 affidavit must have been someone who had access to the affidavit as a result of his or her affiliation with Max 18 and who also had a motive to assist Max 18 with its defense to Paniagua's law suit. There is simply no other plausible explanation

given the credited testimony that Mr. Engberg received six unsigned affidavits from Mr. Schimanski and returned to him six signed affidavits some six months later. That leaves only a small handful of Max 18 employees as possibilities and for present purposes means that the fraud was committed by an agent of Max 18. Accordingly, it is appropriate to hold Max 18 accountable for this fraud upon the Court.

This fraud on the Court is a serious matter that has not, in the Court's view, been addressed appropriately by Max 18 and its counsel. From the outset, when the authenticity of the 2012 Kamel Affidavit was called into question, Mr. Schimanski took the position that simply withdrawing the affidavit solved the problem. He has defended his practice of drafting an affidavit on behalf of a witness with whom he has never spoken and as to whom he had not been given reasonable cause to believe would testify for his client, let alone that she would testify to the particular facts he set forth. He included in the affidavit facts that could be reasonably confirmed *only* through conversation with Ms. Kamel, whether that conversation was undertaken by Mr. Schimanski himself or by his client. The affidavit was not limited to generic information about Morgan's employment policies; it contained specific factual assertions, including that Kamel had never asked Paniagua to work for her as a bartender (¶¶ 7-8); that Kamel had never seen pornographic videos at Morgan's (¶¶ 11-12); and that to Kamel's knowledge no one, including Paniagua, ever had complained about videos played at Morgans; (¶¶ 13-16). Schimanski made no effort to confirm that he had set forth the facts as Kamel would testify, and those facts were not subject confirmation by anyone other than Kamel herself. Schimanski could not produce a single note or document that suggested that either he or anyone from Max 18 ever had discussed these issues with Kamel, and each witness from Max 18 testified that he or she had never done so. The slightest inquiry by Mr. Schimanski would have revealed that there was no

factual basis for certain parts of the 2012 Kamel Affidavit. Nevertheless, Mr. Schimanski has not once expressed any misgivings about his handling of the matter, let alone any acknowledgment of its inadequacy.

Mr. Schimanski appears to argue that the fraud is excusable because most of the facts he set forth on Ms. Kamel's behalf mirror the testimony of some other witnesses. Indeed, much of the generic information in the 2012 Kamel Affidavit (such as the clocking-in procedure at Morgan's) is duplicated in other affidavits, and other witnesses had opinions, for example about the desirability of particular shifts, that are consistent with what Schimanski stated on behalf of Kamel. But that only goes to show that the only added value from the Kamel affidavit was in the facts about her conversations with Paniagua and her personal knowledge of the videos played at Morgan's and the reactions they provoked (or did not provoke). As Mr. Schimanski admits, neither he nor his clients could verify that purported testimony, and now Ms. Kamel herself has contradicted it. Moreover, the time for Mr. Schimanski—or his client, at his direction—to attempt to verify the statements in the affidavit was *before* it was filed. That is the point that Mr. Schimanski seems to be missing with his "no harm, no foul" approach to these proceedings.

It is clear that the 2012 Kamel Affidavit must be stricken given the finding that the signature was forged and that the facts set forth therein are not consistent with Ms. Kamel's recollection of events.[3] But that relief alone is not sufficient to address the fraud that was perpetrated on this Court, which has been forced to expend considerable resources to investigate

---

[3] The Court is unmoved by Max 18's argument that the immaterial discrepancies between Habiba Kamel's live testimony and her 2013 Affidavit—which were explained by Ms. Kamel — show that plaintiff and her counsel are "worse" than Max 18 and its counsel for "presenting an affidavit that contains false information after having had contact with the affiant more than twenty (20) times." *See* Brief, Dkt. # 106, at 6. That Max 18 and its counsel cannot appreciate the difference between a deliberate forgery and an inaccuracy is part and parcel of their casual response the serious misfeasance that has been alleged against them.

this issue, and which could have led to extreme prejudice against the plaintiff if undiscovered. The Court believes that, based on its findings, some further sanction is warranted.

Federal Rule of Civil Procedure 56(h) provides: "If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions." Rule 56(h) is the successor to Rule 56(g), amended in 2010; the new rule (1) makes sanctions discretionary rather than mandatory; (2) imposes a requirement of prior notice and an opportunity to respond; and (3) broadens the additional permissible sanctions. 10B Wright, Miller & Kane, Federal Practice and Procedure Civil 3d. § 2742 (April 2013 Supp.). There was "little case law" explaining proper application of Rule 56(g), *see Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.*, 866 F.2d 11, 16 (1st Cir. 1989), and there is less on Rule 56(h), but the upshot is that the Court "has wide discretion in deciding what constitutes 'bad faith'" 10B Federal Practice and Procedure, *supra*, § 2742 (3d ed. 1998).

The Court is satisfied that the 2012 Kamel Affidavit was submitted by Max 18 in bad faith and hereby provides notice that a sanction against Max 18 under this rule is contemplated. Forging a signature on an affidavit—an action that the Court has attributed to Max 18 based on the evidentiary record—is the epitome of bad faith, whether or not the forger believes that the purported affiant would in fact testify to the facts set forth in the affidavit (and here, the affiant has sworn that she would not). Allowing a party to submit a falsified affidavit with no greater sanction than withdrawing the offending paper would be no sanction at all. Therefore Max 18

15

will be given the chance to address[4] why the following sanctions pursuant to Rule 56(h) should not be imposed:

- Granting the plaintiff's motion to strike.

- Denying Max 18's motion for summary judgment without prejudice. The stricken Kamel affidavit cannot be neatly excised, and, moreover, having been advised of the fraudulent submission, any revised motion and supporting materials should be subjected anew to the requirements of Rule 11, with perhaps a stronger appreciation for the duties of reasonable inquiry it imparts.

- Ordering that Max 18 shall pay the plaintiff's reasonable expenses, including attorney's fees, in bringing the motion to strike, including all costs incurred as a result of the evidentiary hearings and supplemental briefing ordered by the Court.

The Court further contemplates the entry of sanctions against Mr. Schimanski under Federal Rule of Civil Procedure 11 for failing to exercise reasonable diligence to ensure that the motion for summary judgment (and accompanying brief and fact statement) were well-founded to the extent they relied on the 2012 Kamel Affidavit. Mr. Schimanski never spoke to Habiba Kamel and has still not explained who told him that Ms. Kamel would be a witness for Max 18 and what the substance of her testimony would be, let alone how that person came to know what Kamel would testify to. Although an attorney is certainly entitled to rely upon information obtained from others, including investigators or his clients, there must be reasonable cause to

---

[4] Arguably, Max 18 has already been provided, and taken, the opportunity to address the application of sanctions based on the filing of a forged affidavit. Max 18 was informed in the order of August 9, 2013, that the Court was contemplating sanctions and has been given multiple opportunities to respond since then. In open court on September 13, 2013, the Court stated that it would first take supplemental briefing on the factual issue and make factual findings, and then it would solicit additional briefing on the parties regarding what remedial action would be taken, but the parties addressed the import of the fraud in their supplemental briefs. In its most recent submission, it argues, against the weight of the evidence, that the signature on the Kamel 2012 Affidavit was genuine, and that the claim of forgery and the 2013 Kamel Affidavit are "suspect." And even if the 2012 affidavit is false, Max 18 has continued to argue that the only action warranted is withdrawal of the affidavit. These arguments are entirely unpersuasive and any further response should not plough the same, infertile, ground.

trust the accuracy of that information, and a lawyer may not simply put his head in the sand and forgo any attempt to verify information. *City of Livonia Employees' Retirement System and Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013); *U.S. Bank N.A. v. Sullivan-Moore*, 406 F.3d 465, 470 (7th Cir. 2005).

Moreover, Mr. Schimanski was, at a minimum, reckless in his handling of the affidavits after drafting them based on his own recollections rather than by reference to any notes, documents, or witness statements. He gave his client virtually no direction other than, in Mr. Engberg's words, "to get the affidavits signed." He did not ask Mr. Engberg to be sure that the affiants agreed with the information set forth in their statements, nor did he put forth any process for allowing edits or refinements to the testimony. But he relied on the affidavits in the summary judgment motion, the supporting memorandum, and the Local Rule 56.1 statement of facts, all of which are documents on which he placed his signature. By signing and filing those documents, Mr. Schimanski certified that to the best of his "knowledge, information, and belief, formed *after an inquiry reasonable under the circumstances*" that they were not filed for any improper purpose and that the factual contentions had evidentiary support, among other things. *See* Fed. R. Civ. P. 11(b)(1), (b)(3). With respect to the Kamel 2012 Affidavit, there does not appear to have been any inquiry, let alone a reasonable one.

Given that Mr. Schimanski was able to easily discover after the Kamel affidavit was challenged that certain facts therein could not be verified by his records or by his client, it is reasonable to have expected him to make such inquiries *before* submitting the affidavit to the court and relying on it as a basis for defeating the plaintiff's claims. The Court simply rejects Mr. Schimanski's contention that Ms. Kamel's admitted unwillingness to cooperate with him *after she learned of the forged document* shows that "there was nothing more than Max 18 or Mr.

17

Schimanski could have done regarding the authenticity or accuracy of the affidavit." Brief, Dkt. # 106, at 7. Even if it is true that Kamel would not have cooperated with the defendant, that does not show that Mr. Schimanski had done all he could and was therefore reasonable in filing the affidavit. If Kamel would not cooperate with the defendant, then her affidavit should not have been used in support of its motion; and this is the result Mr. Schimanski avoided when he failed to make any inquiry about Kamel's version of events before inventing it for her. Moreover, the failure of Mr. Schimanski, so far, to meaningfully take any responsibility—for himself or his client—for the circumstances that led to his filing of a fraudulent affidavit, is of no small concern to the Court. Rule 11 sanctions might therefore be appropriate here, as they are primarily intended to deter misconduct rather than to compensate for its consequences. *See Vollmer*, 248 F.3d at 711 n.11 (citing Fed. R. Civ. P. 11 Advisory Committee's Notes). Any such monetary sanction would be payable to the court, not the plaintiff, and would not be related to the fee award contemplated pursuant to Rule 56(h). *See id.*

There is no Rule 11 motion[5] before the Court and, although the tenor of these proceedings has been clear, the Court has not previously warned Mr. Schimanski that Rule 11 sanctions against him were on the table. Accordingly, pursuant to Rule 11(c)(3), the Court must give Mr. Schimanski the opportunity to respond before deciding to sanction him *sua sponte*. *See Vollmer v. Publishers Clearing House*, 248 F.3d 698, 710 (7th Cir. 2001). The plaintiff has made her position on Rule 11 sanctions clear in her latest supplemental brief, and therefore the Court does not need any further input from her or her counsel on that subject.

---

[5] The plaintiff has at times made reference to Rule 11 but, to date, has not filed a separate motion for any sanction pursuant to Rule 11, nor made any representation that she has observed any of the prerequisites to requesting sanctions under that rule. *See* Fed. R. Civ. P. 11(c)(2); *see Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147, 150-151 (7th Cir. 1996).

The Court therefore issues a rule to show cause why attorney Scott Schimanski should not be sanctioned pursuant to Federal Rule of Civil Procedure 11 for failing to make an inquiry reasonable under the circumstances before drafting, filing, and relying upon the 2012 Kamel Affidavit—specifically, failing to exercise reasonable diligence to ensure the authenticity and accuracy of the Kamel affidavit or to give his client sufficient direction regarding the handling of the draft affidavits. A hearing is scheduled for Friday, November 15, 2013, at 2:00 p.m. On or before November 12, 2013, Mr. Schimanski may submit whatever argument or evidence he wishes the court to consider. The plaintiff should not file any additional brief.

Any response on behalf of Max 18 to the contemplated Rule 56(h) sanctions must also be submitted to the Court by November 12, 2013. Again, no further briefing by the plaintiff is permitted absent further order of the Court.

Date: November 4, 2013

John J. Tharp, Jr.
United States District Judge

19